ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
Job Options, Inc. ) ASBCA No. 59314
)
Under Contract No. HDEC08-13-C-0003 )

APPEARANCE FOR THE APPELLANT: Mr. Jeffrey Johnson
CEO

APPEARANCE FOR THE GOVERNMENT: Ronald S. Horn, Esq.
Assistant General Counsel
Defense Commissary Agency
Fort Lee, VA

OPINION BY ADMINISTRATIVE JUDGE THRASHER
PURSUANT TO RULE 12.3

Job Options, Inc. (JOI), seeks an equitable adjustment for increased labor costs associated with the storage of additional goods under a contract with the Defense Commissary Agency (DeCA) to provide inventory management, shelf stocking, and janitorial services for the Camp Pendleton Commissary. The parties agreed to submit the appeal on the record pursuant to Board Rule 11. JOI elected the Board Rule 12.3 accelerated procedure on 14 May 2014. The government concedes entitlement and this decision only addresses quantum. We have jurisdiction pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 7101-7109.

FINDINGS OF FACT

*The Contract*

1. JOI was awarded Contract No. HDEC08-13-C-0003 on 30 October 2012 to provide shelf stocking, receiving/storage/holding area operations (RSHA), and custodial tasks for the Camp Pendleton Marine Corps Base (MCB) Commissary, Camp Pendleton MCB, California (R4, tab 1 at 1, 61).[1] The contract was awarded as a firm-fixed-price

---

[1] The award was sole source to JOI because the services required, shelf stocking, RSHA, and custodial tasks, are listed on the procurement list established by the Committee for Purchase From People Who Are Blind or Severely Disabled pursuant to the provisions of the Javits-Wagner-O'Day Act, 41 U.S.C. §§ 8501-8506. This required the government to obtain the services from a qualified non-profit work center and JOI was chosen to provide the service. (R4, tab 32)

(FFP) contract with a base year and four option years (R4, tab 1 at 3-25). This appeal only relates to the base year, 1 November 2012 through 31 October 2013, and only three of the nine areas of performance, Shelf Stocking Operations, Overwrites, and Storing Items under RSHA Operations.

*Shelf Stocking Operations & Overwrites*

2. The number of cases JOI stocks every month is based upon orders from the Frequent Delivery System (FDS) algorithm. The FDS algorithm provides an estimate of how much product is necessary to fill the shelves. Because the FDS algorithm is not 100% accurate, occasionally some stock cannot be shelved and must be stored. This extra stock, that is delivered but has to be temporarily stored, is referred to as an Overwrite. The Performance Work Statement (PWS), § 4.3.3.2.1.2., defines Overwrite cases as:

> [C]ases that the Government has ordered from FDS distributors for replenishment stocking, and that the Contractor has moved to the sales floor to stock; but which the Contractor cannot stock in shelf space available in item allocations.

(R4, tab 1 at 79)

3. The contract recognizes there is a cost incurred with removing (pulling) cases from the floor to be temporarily stored and provides a mechanism to compensate the contractor if the number of monthly overwrites exceeds an estimated monthly overwrite percentage. PWS § 4.3.3.8. provides a measure of estimated overwrite cases per month, stating:

> The estimated percentage of overwrite cases per month is 7% percent of the total monthly cases available for stocking by the Contractor. In accordance with Schedule B of the contract, the Contractor shall be entitled to invoice the Government for the number of cases exceeding the estimated monthly overwrite percentage. Any case(s) that the Government specifically directs the Contractor to stock shall be included in the number of total cases available for stocking.

(R4, tab 1 at 81) Computation for payment for excess overwrites is found in Technical Exhibit 1 ¶ 5.1.3., which states in pertinent part:

> The Contractor shall be entitled to invoice the Government for the number of cases exceeding the estimated monthly

2

overwrite percentage. The price per case for invoiced overwrites shall be a percent of the current per-case stocking price, as indicated on Schedule B of this contract. There shall be no claims against the Government when overwrites are at or below the estimated percentage for any month.

(R4, tab 1 at 114)

4. Shelf stocking operations are performed on a fixed-price basis: JOI is paid a set price for each case it actually stocks. JOI invoiced for payment using "SHELF STOCKING CASES STOCKED" (Form 70-114) (R4, tab 22 at 8). The price per case, as bid by JOI, was based upon an annual estimated quantity of cases provided in the solicitation (R4, tab 1 at 3, contract line item no. (CLIN) 0001AA). JOI's bid price included the cost of overwrites, i.e., pulling the excess cases and temporarily storing them, up to 7% each month. CLIN 0001AA states that JOI will, "[P]erform Shelf Stocking Operations that include overwrites between 0% and 7% in accordance with paragraph 4.3.3.8. of the PWS, Attachment 1." (*Id.*)

5. There is no basis in the contract for modifying the stocking unit price during the same contract performance period if the actual cases stocked exceed the estimated quantities. However, the contract does provide for adjusting the stocking unit price in a follow-on year under certain limited circumstances. Clause 52.217-4506(a), PRICE ADJUSTMENT FOR FOLLOW-ON YEAR REPRICING (JUL 2009), states in pertinent part:

> a. This is a firm, fixed-price contract with provisions for unit prices that are not subject to adjustments on the basis of the contractor's cost experience or cost growth in performing the contract. The only factors subject to adjustment due to follow-on year repricing will be wage rates/fringes, federal or state mandated changes to payroll expenses, and other payroll expense changes deemed appropriate for payment by the contracting officer that may be outside the contractor's control such as Worker's Compensation premiums. Scope and workload changes shall be handled in a separate proposal from renewal proposals.
>
> ....
>
> e. On a case-by-case basis, the Contracting Officer shall review the estimated shelf stocking workload in the contract to ensure it adequately reflects the actual cases stocked. The contractor may request that the Contracting Officer review the estimated shelf stocking workload if there is a 10% or greater variance in workload for cases stocked which occurs

3

over a six-month period. Workload/price changes are not mandatory/automatic when reviews occur, and are dependent upon reasons for and/or circumstances surrounding the variance. If the Contracting Officer determines an adjustment is warranted, the price should be negotiated and the contract modified accordingly.

(R4, tab 1 at 38-39)

*Storing Items under RSHA Operations*

6. The process of storing and pulling items is a RSHA function (R4, tab 1 at 85, §§ 4.4.2.7., 4.4.2.8.). The stored items only include operating supply items, residual stock from displays and semi-perishable items identified by the store director (*id.* § 4.4.2.7.). Unlike shelf stocking operations, RSHA operations are priced, and the contractor is paid, a fixed monthly amount to provide the service. Although specific products stored have an associated estimate of cases per month to be stored, there is no basis in the contract for reimbursing the contractor for the actual number of cases above the estimated amounts. PWS § 4.4.2.7. provided an estimated number of cases to be stored each month, as follows:

| Estimated number of line items and cases per month to STORE: | | |
|---|---|---|
| | Line Items | Cases |
| Semi-perishables, (a): | 265 | 8,000 |
| Operating Supplies, (b): | 55 | 600 |
| TOTAL TO STORE (a+b): | 320 | 8,600 |

(*Id.*)

7. On 20 November 2013, JOI submitted a request for equitable adjustment (REA) to the contracting officer (CO) requesting a CO's final decision (COFD) granting a contract adjustment of $48,006.42 for additional labor incurred as a result of storing more semi-perishable cases in the warehouse than estimated in the RSHA section of the PWS during the period 1 November 2012 through 31 October 2013. JOI explained its basis for the request and calculation methodology as follows:

> This occurred as the result of significantly smaller percentage of the total cases stocked from the nightly FDS load than was contemplated in the contract coupled with a much higher percentage of cases stocked from the residual sections of the warehouse. Special buys and promotional purchases accounted for a much greater percentage of total orders than was estimated in the PWS of the contract. The extra labor incurred from warehousing and storing more

4

cases in the crowded warehouse and then working the residual stock onto the shelves on the sales floor is the justification for this request for equitable adjustment.

We are unable to use the monthly RSHA report to provide an accurate number for cases JOI stored over the time period involved because DECA is failing to produce and record the required daily and monthly data for cases stored. The PWS for this contract however, calls for 96,000 cases annually to be stored in the warehouse. The actual figure that we derived during the twelve months (Nov 2012 through Oct 2013) is 193,194 additional cases that had to be warehoused and stored. Eventually these stored cases were moved from the warehouse to their place on the shelf.

We calculate additional labor in the following manner: the additional 193,194 cases stored divided by 86 cases per hour (which is the productivity factor in storing merchandise) for a total of 2,246.44 hours. At a fully burdened wage rate of $21.37 dollars for a material handling position this yields a total REA of $48,006.42.

(R4, tab 11) JOI removed all actual FDS overwrites from the calculations, stating, "Although overwrites are not a part of the number of estimated cases to store in accordance with 4.4.2.7, we have removed them so we can narrow down the cases and show the actual additional cases Stored and Stocked from the backroom" (*id.* at 2). The claim requested a final decision from the CO within 60 days (*id.* at 1).

8. The CO responded with a final decision on 25 April 2014 granting JOI $40,524.95 of the $48,006.42 claimed. The decision accepted JOI's general methodology for calculating the amount due but disagreed with some areas of JOI's calculations, stating:

In reviewing the documentation submitted, as well as case count sheets for the period of time referenced above, the following determinations were made:

1. New FDS cases totaled 688,548 vs. 688,835.

2. Overwrite cases totaled 50,266 vs. 50,276.

3. New FDS cases stocked totaled 638,282 vs. 638,559.

4. Actual cases stocked totaled 991,281 vs. 991,340.

5

5. The difference between the total cases stocked and the new FDS cases stocked was 352,999 vs. 352,781.

6. Removing the percentage of overwrite cases specified within the PWS (7% of 1,048,644 estimated annual cases or 73,405 cases) and stored cases (103,200 per the PWS), results in 176,394. This methodology provided consideration for the overwrite cases that were less than the specified percentage, or 23,139 less cases.

7. In addition to the removal of the cases associated with overwrites and stored cases, it was determined appropriate to also remove the cases associated with Day Vendor and Day FDS. Day Vendor cases are issued by the government to the contractor to stock, to remedy not in stock (NIS) situations at the merchandise shelf location. Day FDS cases do not require the level of warehousing that is required for other types of cases, such as overwrites and stored cases. The removal of these cases (Day Vendor @ 0 cases and Day FDS @ 13,308 vs. 13,311 cases) results in a balance of residual cases for the specified period of performance of 163,086 vs. 193,194.

8. Loaded wage rate for Material Handler of $21.37[.]

As a result, the CO denied the claim in part stating:

> [It] has been determined that the contractor warehoused an additional 163,086 cases of merchandise during the specified period of performance. Using the productivity rate referenced within the claim, the effort associated with the handling of the additional cases results in a total of 1,896.35 additional labor hours. As such, the monies due the contractor total $40,524.95."

(R4, tab 22 at 1-2)

9. JOI appealed the COFD to the Board on 14 May 2014 electing the Board's accelerated procedures under Board Rule 12.3 (Bd. corr.). In its appeal, JOI alleged that the CO "inappropriately applied a flawed and inconsistent methodology" (compl. at 1).

10. In its answer, the government recognized that a segment of the CO's original determination was incorrect; that the correct number of stored cases should be 103,200,

which combined the storage amount for semi-perishables and operating supplies, and conceded the appropriate number of total stored cases should be 96,000. Consequently, the government conceded credit to JOI for the 7,200 case difference entitling JOI to an additional $1,789.12. (Answer at 3)

11. The parties elected to submit their cases on the record pursuant to Board Rule 11 (Bd. corr. fax dtd. 24 July 2014).

## DECISION

The government concedes appellant is entitled to an equitable adjustment for labor costs incurred in storing additional cases of semi-perishable goods that exceed the number of cases estimated in the contract (finding 8). At this point, the dispute is only about the methodology for calculating appellant's recovery. Specifically, the parties only disagree regarding the correct methodology for calculating overwrites and the number values within the various categories stocked and stored items. The following is a summary of the calculation methodology employed by the parties:

| | | JOI Calculation | DeCA Calculation | Difference |
|---|---|---|---|---|
| 1 | Night FDS Cases Received | 688,835 | 688,548 | (287) |
| 2 | Less FDS Night Overwrites | -50,276 | -50,266 | (10) |
| 3 | Actual FDS Cases Stocked at Night (row 1 minus 2) | 638,559 | 638,282 | (277) |
| 4 | Total Cases Stocked | 991,340 | 991,281 | (59) |
| 5 | Total Cases Warehoused (row 4 minus 3) | 352,781 | 352,999 | 218 |
| 6 | Subtract Overwrites | -50,276 | -73,405 | 23,129 |
| 7 | Subtract: Number of Stored Cases Estimated in Contract | -96,000 | -96,000 | 0 |
| 8 | Sub-Total (row 5 minus rows 6 & 7) | 206,505 | 183,594 | (22,911) |
| 9 | Subtract: Day vendor cases | -0 | -0 | 0 |
| 10 | Subtract: Day FDS Cases | -13,311 | -13,308 | (3) |
| 11 | Additional Cases stored (row 8 minus rows 9 & 10) | 193,194 | 170,286 | (22,908) |

We conclude that the government's numbers for stocking and storing are more accurate and should be used in our calculation. These numbers are derived from the monthly totals on the "SHELF STOCKING CASES STOCKED" form used by appellant to invoice and receive payment (finding 4). Therefore, the fundamental remaining difference between the parties is what number should be used in the calculating overwrites (line 6 above). Appellant argues the actual number of

7

overwrites it stored should be applied in the calculation while the government argues the correct number should be the total estimated number appellant bid on, which was the basis for determining the price.

Appellant's argument focuses upon the overwrites associated with the specific items that resulted in excess storage costs. The parties agree the specific items associated with the claimed excess storage had an estimated storage of 96,000 store merchandise cases annually with 7% of those cases being overwrites. Appellant actually stored 193,194 extra cases of store merchandise, of which 50,276 were overwrite cases. Appellant argues the actual number of overwrites should be subtracted, without regard to the amount of total overwrite services performed. (App. br. at 5-6)

The government agrees appellant is entitled to recover for amounts stored above the estimates in the contract but argues that appellant's methodology does not recognize the fact that the contract price already accounts for 73,405 overwrite cases for which appellant has already been paid; the government's position is that to allow an additional 23,129 cases to be included in the calculation would result in the government paying twice for these items (gov't br. at 3-5).

We agree with the government; if the actual number of overwrites are subtracted, as appellant argues, appellant will be paid twice for the labor associated with storing 23,129 cases. Despite appellant's arguments to the contrary, both the stocking and storage (RSHA) service areas are priced on a FFP basis (findings 4, 6; app. reply br. at 1, 3-5). However, appellant may invoice for the costs of overwrites that exceed 7% in a given month (finding 3). Appellant's bid price presumably included labor costs in both service areas, including the labor costs of temporarily storing overwrites up to 7% of the cases stored. So the price for stocking cases already includes the cost of labor for temporarily storing overwrite cases up to 7% of the estimated total. As a result, appellant has been paid for any overwrites up to 7% of the cases stored. The calculation used here by the parties calculates the total number of items stocked and warehoused subtracting out the number of cases estimated in the specific area that appellant claims excess storage labor costs. If the number of overwrites subtracted are limited to the actual number associated with the specific service area, as appellant argues, it will undercount the number of overwrites. We conclude the government's proposed method of calculating overwrites is more accurate, i.e., 7% of the total annual estimated stocking service requirement (day, night and display stocking estimates).

8

## CONCLUSION

Subtracting the anticipated total number of overwrites, 73,405, results in 170,286 additional total cases stored. Applying the labor productivity factor of 86 cases per hour yields 1,980 additional hours and when multiplied by the wage rate of $21.37 equates to a total due of $42,312.60. The COFD granted appellant $40,524.95 (finding 8). Therefore, this appeal is sustained in the amount of $1,787.65 with CDA interest thereon starting 27 April 2014. The balance of the costs claimed are denied.

Dated: 5 November 2014

JOHN J. THRASHER
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59314, Appeal of Job Options, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

9